# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# SOUTHEASTERN DIVISION

TERESA ANN WILLIAMS,     )
                                    )
       **Plaintiff,**           )
                                    )
   **v.**                        )    **Case number 1:05cv0213 TCM**
                                    )
**MICHAEL J. ASTRUE,**       )
**Commissioner of Social Security,**[1]  )
                                  )
       **Defendant.**         )

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying the applications of Teresa Ann Williams for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, and supplemental security income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1383b, is before the Court[2] for a final disposition. Ms. Williams has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer.

---

[1] Mr. Astrue was sworn in as the Commissioner of Social Security on February 12, 2007, and is hereby substituted as defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2] The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

## Procedural History

Alleging a disability beginning on December 5, 2002, caused by bilateral carpal tunnel syndrome, shoulder problems, high blood pressure, and acid reflux disease, Teresa Ann Williams ("Plaintiff") applied for DIB and SSI in February 2004. (R. at 72-75, 95-97, 141-43.)[3] Her applications were denied initially and after a hearing held in January 2005 before Administrative Law Judge ("ALJ") Craig Ellis. (Id. at 17-56, 63-67, 82, 84-88, 98, 101, 126-127A.) The Appeals Council initially denied Plaintiff's request for review. (Id. at 8-10.) After submission of additional evidence, the Appeals Council set aside that decision, considered the evidence, and again denied review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 3-6.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff testified she was born on September 14, 1961, and was then 43 years' old. (Id. at 32.) She was divorced and lived with her daughter, who would be 15 years' old in a few days, and her "significant other," Michael. (Id.) He was 40 years' old and worked as a maintenance man. (Id.) Plaintiff and her daughter receive Medicaid. (Id.) She also receives child support and food stamps. (Id.) Plaintiff completed the 11th grade, but never

---

[3]References to "R." are to the administrative record filed by the Commissioner with his answer.

received a GED.  (Id.)  She is 5 feet 5 ½ inches tall and weighs 160 pounds.  (Id. at 34.)  She can read, but has physical difficulty writing.  (Id.)

Plaintiff last worked in December 2002, when she left Tyson Foods ("Tyson's") on a leave of absence.  (Id. at 36.)  She had started working for Tyson's in January 2001.  (Id.)  Her hands started bothering her in December 2002.  (Id. at 46.)  The company sent her to a doctor; he put her in arm braces and restricted her to light duty.  (Id. at 36.)  She first started at Tyson's as a trimmer and then worked bagging or boxing leg quarters.  (Id.)

After she stopped working, she had two hand surgeries, one on each hand.  (Id. at 37.)  The surgery on her right hand was in January 2003; on her left hand, in March 2003.  (Id.)  Her worker's compensation claim was still pending.  (Id.)  She tried to return to Tyson's when she was on hydrocodone, but the pain was too great.  (Id. at 53.)

Plaintiff stopped smoking one and one-half years ago; she does not drink.  (Id. at 38.)

She explained that she starts doing the laundry, but then has trouble taking it out of the washing machine if the laundry is too heavy.  (Id. at 40.)  Her daughter does the dishes.  (Id.)  Plaintiff cannot do them because she drops a lot of things and thinks the plates are clean when they are not.  (Id.)  For fun and recreation, she sits and watches television.  (Id.)  When she goes grocery shopping, she uses an electric wheelchair and is accompanied by her daughter.  (Id. at 50-51.)

Plaintiff further testified that she was soon to have left knee surgery.  (Id. at 40.)  She had also injured her right knee when the three-wheeler she was riding went off a bank and fell on her right foot and leg.  (Id. at 41.)  The accident happened 17 years ago; she had not

been on a three-wheeler since.  (Id. at 42, 48-49.)  She did not know why her doctor would say it was a recent accident.  (Id. at 41.)

Asked if she had problems with personal grooming, Plaintiff replied that she sometimes had trouble with her hair and had to have someone comb or brush it.  (Id. at 42.)  If she cooked, she could not use a knife because her hand would not grip it hard enough.  (Id. at 52.)  She cannot vacuum.  (Id.)  If she tried to fold laundry, her pain would increase.  (Id.)  She hoped she could start exercising after her knee surgery.  (Id.)  Plaintiff had trouble carrying a two-liter bottle of soda.  (Id. at 43.)  Before she stumbled and injured her left knee, she usually had no problem walking and standing.  (Id.)  Her right knee sometimes hurt, but it usually got better.  (Id.)  She was fine until April 2004, when she slid down a hill when turkey hunting with Michael.  (Id. at 43-44.)

She was treated by a psychologist for stress three times in July 2000.  (Id. at 44-45.)

Plaintiff described her current problems as her left knee, right arm, and right elbow.  (Id. at 45.)  On a scale of one to ten, with ten being the worst, her left knee pain was usually a nine and her right arm pain as usually an eight.  (Id.)  At its worst, the pain was a ten.  (Id.)  She takes a pill every six hours for pain relief and takes a muscle relaxer.  (Id. at 46.)  The hand braces she wore at the hearing she had worn since December 2003.  (Id. at 47.)  Her doctor had told her to wear them all the time; however, she sometimes took them off at night.  (Id.)  Asked to describe the problems with her hands, including the burning sensation she had earlier described, Plaintiff explained that her hands go numb and have no strength.  (Id. at 48.)  The pain had lessened immediately after her surgery, but had started back again.  (Id.)

She had been diagnosed with cubital tunnel syndrome[4] in 2003, but she had not had any treatment for it.  (Id. at 50.)  She was waiting for her worker's compensation claim to settle.  (Id.)

Plaintiff had worked as a certified nurse's assistant ("CNA") before working at Tyson's.  (Id. at 48.)  She was no longer able to do that work.  (Id. at 53.)  She had also worked once at a convenience store.  (Id.)  She could not return to that work because she could no longer hold onto anything, she had trouble picking up coins, and she could no longer move about to stock the shelves.  (Id. at 54.)

Plaintiff drove to the hearing site – 45 miles from her home – by herself because she had no one who could drive her.  (Id. at 51.)  The farthest she usually drove was 15 miles. (Id. at 52.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, records from various health care providers, and evaluation reports.

When applying for DIB and SSI, Plaintiff listed carpal tunnel syndrome in both hands, shoulder problems, high blood pressure, and acid reflux disease as her impairments.  (Id. at 182.)  Because of these impairments, she cannot lift or grip with either hand and cannot

---

[4]"Cubital tunnel syndrome occurs when there is compression or injury of the ulnar nerve in the cubital tunnel. . . .  Patients with this condition commonly exhibit symptoms of intermittent numbness or tingling in the ring and little fingers of the affected extremity."  Indiana Hand Center, What is Cubital Tunnel Syndrome?, http://www.indianahandcenter.com/medical_cubital.html (last visited March 13, 2007).

completely open or close her right hand.  (Id.)  She also has right shoulder pain and pain in her left elbow.  (Id.)  Her impairments prevented her from working as of December 31, 2002.  (Id.)  She had tried to work after that, but had to stop in May 2003 because of her carpal tunnel syndrome and pain in her arms, elbows, and right shoulder.  (Id.)  The job she had held for the longest was as a CNA.  (Id. at 183.)  When she worked as a CNA, she could walk or stand and handle, grab, or grasp big objects for six hours; sit and write, type, or handle small objects for one hour; and stoop or reach for four hours.  (Id.)  The heaviest weight she lifted was 100 pounds.  (Id.)  Her doctors included Richard E. Coin, M.D.; James Critchlow, M.D.; D.L. Davis, M.D.; Gary Eaton, D.O.; James W. Gieselmann, M.D., Steven Maher, M.D.; August Ritter, III, M.D.; and Steven Winters, M.D.  (Id. at 185-87.)  Dr. Maher prescribed Altrax, Claritin, hydrocholorothiazide, Toprol, Wellbutrin, and Zantac.  (Id. at 189.)  Plaintiff also took Prilosec, an over-the-counter medication.  (Id.)

In a Work History Report, Plaintiff stated that she worked at Tyson's from May 2003 to June 2003, when her doctor advised her to take a medical leave of absence due to the problems with her hands.  (Id. at 174.)  This work was considered an unsuccessful work attempt.  (Id. at 180.)

The month after she filed her applications, Plaintiff reported on a questionnaire that any movements or activities caused her symptoms to become worse.  (Id. at 154.)  Since becoming unable to work, she had been able to do laundry, dishes, make the bed and change sheets, vacuum, and sweep.  (Id. at 155.)  She can shop as long as she is able to push a cart.  (Id.)  She prepares easy meals, and has to use wide utensils that are easy to grasp.  (Id.)  She

cannot pick up pots and pans.  (Id.)  She can go to sleep if the pain is not too bad.  (Id.)  She needs help combing her hair if it has a lot of knots.  (Id.)  She wears clothing without buttons or hard zippers.  (Id.)  She is not able to do any hobbies or activities.  (Id. at 156.)  During the day, she watches television, walks, tries to do the dishes, and fixes supper.  (Id.)  She can drive, but not very far.  (Id.)  When she does drive, she goes to the store 20 miles away.  (Id.)

Between 1977 and 2002, inclusive, Plaintiff had earnings in 1977, 1980, 1983, 1985, 1987, 1988, and 1994 through 2002.  (Id. at 77.)  In only three years were her annual earnings greater than $10,000.00.  (Id.)  Those three years were 1997, 2001, and 2002.  (Id.) her earnings were the highest in 2002; they were then $15,100.00.  (Id.)

Plaintiff's medical records before the ALJ begin in 2000.

The earliest medical record is of Dr. Gieselmann.  (Id. at 403.)  She consulted him in June 2000 for abdominal pain.  (Id.)  She reported that she and her child had been evicted from their house the month before.  (Id.)  A test revealed that she had duodenitis, or inflammation of the duodenum (the first division of the small intestine).  (Id.)  She was prescribed Prilosec and scheduled for an esophagogastroduodenoscopy ("EGD").  (Id.)  That test did not reveal the cause of her vomiting.  (Id. at 402.)  Dr. Gieselmann concluded that she should see her family physician about a medication to "get her over her social life crisis." (Id.)  If that did not work, then a referral to a gastroenterologist would be considered.  (Id.)

The earliest record of Dr. Maher is dated January 8, 2001.  (Id. at 307.)  This record characterizes Plaintiff's visit as a "follow up of her depression and GERD."  (Id. at 307.)  He notes that she been started on Prilosec and Prozac at her last visit.  (Id.)  She reported that

her gastrointestinal symptoms were "75% better." (<u>Id.</u>) She had some mild abdominal pain, but contributed that to her pancreatic damage. (<u>Id.</u>) Although she had been told by the doctor who had treated her 15 years before for pancreatitis that she was going to have chronic problems with her pancreas, she had never again consulted that doctor. (<u>Id.</u>) Her recent bout of pancreatic pain had happened after she had had several beers. (<u>Id.</u>) Dr. Maher explained that she needed to avoid alcohol if she wanted to avoid pancreatic problems. (<u>Id.</u>) Her depression was better; she was more vibrant and out-going. (<u>Id.</u>) The Prilosec and Prozac were continued. (<u>Id.</u>) She next consulted Dr. Maher for vomiting and diarrhea caused by a virus. (<u>Id.</u> at 306.)

On February 8, she complained to Dr. Maher about pain in the fingers of her right hand; her right fifth finger was infected. (<u>Id.</u> at 304.) She had recently began her job cutting up chickens at Tyson's. (<u>Id.</u>) She denied any other complaints. (<u>Id.</u>) He prescribed an antibiotic for three days and told her to take ibuprofen twice a day with food. (<u>Id.</u>) On March 19, Plaintiff consulted a nurse practitioner in Dr. Maher's office about low back pain caused by an urinary tract infection. (<u>Id.</u> at 302-03.) She was prescribed an antibiotic. (<u>Id.</u> at 303.) Two days later, she still had the low back pain and had had to leave work the night before. (<u>Id.</u> at 301.) She had negative straight leg raises. (<u>Id.</u>) Plaintiff was given samples of a medication and told to drink lots of fluid and cranberry juice. (<u>Id.</u>) On April 2, she reported that her back pain was "much better." (<u>Id.</u> at 300.) She did complain of her right fourth finger locking in a flexed position. (<u>Id.</u>) It had been doing so for some time, but was getting worse. (<u>Id.</u>) The finger was injected with a local anesthetic. (<u>Id.</u>) When

complaining to Dr. Maher on April 26 about a rash she also told him that she had stopped taking the Prozac, "after just a few doses," and her symptoms of depression had returned. (Id. at 298, 299.) She was taking an energy supplement she bought at a convenience store. (Id. at 299.) Dr. Maher told her to stop taking the supplement until she returned in a couple of weeks. (Id.) They would then discuss restarting her on the Prozac. (Id.)

On April 30, Plaintiff explained to Dr. Maher that she had stopped taking Prozac because she did not feel like she was in the same category as the people she saw in the nursing home who were taking it. (Id. at 298.) Although she agreed to stop taking the energy supplement, she refused to let Dr. Maher dispose of the bottle she had brought to his office for his inspection. (Id.) He suspected she was going to take the supplement despite his warnings of heart problems and his opinion that the supplement was contributing to her insomnia. (Id.) She agreed to try another antidepressant, Celexa, and a medication, Elavil, to help her sleep. (Id.) When she next consulted Dr. Maher, about abdominal pain and vomiting, she told him she was not seeing "a lot of improvement" on the Celexa and was sleeping only about four hours. (Id.) She was no longer taking the supplement. (Id.) On June 3, Plaintiff reported that the Elavil and Celexa were both working well; she was sleeping well. (Id. at 296.) She had not been following a diet for her gastroesophageal reflux disease ("GERD"); one was discussed with her.

At her next, follow-up visit on July 2, "[i]n terms of her depression, she said that she is doing okay." (Id. at 295.) She had run out of the Celexa and could tell the difference. (Id.) Her depression was described as stable; her GERD as "improved but not resolved."

(Id.)  Four days later, Plaintiff went to the emergency room with complaints of abdominal pain.  (Id. at 348-49.)

On July 16, she returned to Dr. Gieselmann with complaints of upper gastric pain. (Id. at 401.)  He noted that a subsequent test, in June 2000, had showed no duodenitis.  (Id.) He scheduled her for another EGD and also noted that the current situation was "reminiscent of the past work-up where no significant GERD was found, although she is on medication for it."  (Id.)

A notation dated August 20 in Dr. Maher's records indicates that Plaintiff was no longer taking the Elavil or the Celexa.  (Id. at 294, 295.)  She had entered into a positive relationship and her ex-husband had left town.  (Id. at 294.)  She felt she no longer needed the antidepressants.  (Id.)  The fourth finger on her right hand was locking up again; she received another injection.  (Id.)  She had been scheduled for an EGD to investigate the source of her reflux disease, but she had cancelled it, reporting that she was doing better on the Prilosec.  (Id.)  She was to return if the injection did not work well, and was warned about the possibility of a surgical release being needed if it did not.  (Id.)  Eight days later, she complained of a headache and vomiting for the past 24 hours; she was given a prescription for an antihistamine and told to follow a clear liquid diet for the next 24 hours. (Id. at 293.)  Her allergies were listed as codeine and alcohol.  (Id.)  On September 17, she reported that her right fourth finger was improved; however, her left second finger was painful.  (Id. at 292.)  Also, her blood pressure was elevated.  (Id.)  Her depression was

"apparently resolved." (Id.) She had had three beers on Saturday. (Id.) On September 26, Plaintiff again complained of vomiting. (Id. at 291.) The diagnosis was epigastritis. (Id.)

Plaintiff's next visits to Dr. Maher concerned a urinary tract infection. (Id. at 289-90.) At a visit on October 31, she reported feeling very nervous; she was diagnosed with anxiety and depression. (Id. at 289.)

A few weeks before this visit, Plaintiff consulted Brett C. Barnes, M.D., an orthopaedic surgeon. (Id. at 392-93.) Dr. Barnes noted that Plaintiff had had difficulties with her left hand since cutting her left index finger at work in July. (Id. at 392.) He assessed her impairments as "[r]ight hand third and fourth finger triggering, probably secondary to tenosynovitis . . . [and] [l]eft index finger extensor tendon laceration with persistent swelling and loss of motion." (Id.) He agreed with Dr. Maher that further injections would not be beneficial and that it was reasonable to consider surgical options. (Id. at 393.)

After catching her left little finger in a door at Tyson's, Plaintiff consulted Dr. Critchlow on January 22, 2002. (Id. at 398.) An x-ray showed no fracture. (Id.)

Plaintiff consulted Dr. Maher again on February 12. (Id. at 279.) She had headaches, moderate congestion, a dry cough, nausea, and "severe malaise." (Id.) Her prescription for Prilosec was renewed; she was also prescribed something for indigestion, an antibiotic, and an antihistamine. (Id.) Two days later, on a Thursday, Plaintiff reported that she had almost passed out at work. (Id. at 278.) She felt better after eating. (Id.) She was given a work excuse. (Id.) If she did not feel like going to work the next day, she was to return to Dr. Maher. (Id. at 277.) She did so. (Id.) She did not appear to be in any acute distress, but did

complain of low back pain and thought she might have an urinary tract infection. (Id.) She was to continue taking the antibiotic and was released to return to work on Monday. (Id.)

Two weeks later, Plaintiff complained to Dr. Maher of frequently feeling light-headed when first standing. (Id. at 276.) The next month, Plaintiff was diagnosed with depression and malaise. (Id. at 275.) It was noted that she denied being depressed, but "has always seemed somewhat depressed." (Id.) She had been treated in the past but had not stayed on the medication. (Id.)

Plaintiff consulted Dr. Critchlow again on April 16, complaining of pain and numbness in both hands. (Id. at 398.) "On pin prick she . . . exhibit[ed] some median nerve hypalgesia bilaterally." (Id.) She was prescribed a medication, given some wrist splints, and instructed to limit her use of her hands for the next three weeks. (Id.) Two weeks later, she complained of an allergic reaction to the medication. (Id.) She was prescribed a different antihistamine, Zyrtec. (Id.) On May 7, she reported to Dr. Critchlow that there was no improvement in her hands. (Id. at 399.) She was to take Tylenol and continue wearing the wrist splints. (Id.) If the lack of improvement continued, she was to have an electromyogram and nerve conduction velocity study ("EMG/NCV"). (Id.)

At Dr. Critchlow's request, an EMG/NCV was conducted on May 12 by Riyadha J. Tellow, M.D., a neurologist. (Id. at 394-95.) The study showed no evidence of carpal tunnel syndrome, ulnar neuropathy, or cervical radiculopathy. (Id. at 394.) Plaintiff was subsequently released from Dr. Critchlow's care. (Id. at 399.)

On May 23, Plaintiff consulted Dr. Maher about an upper respiratory infection. (Id. at 274.) She had been taking an excessive amount of Tylenol and was told a maximum amount to take. (Id.)

On June 12, Plaintiff again consulted Dr. Barnes. (Id. at 391.) He noted that an EMG/NCV indicated no abnormalities. (Id.) He also noted that she had a negative Tinel's test,[5] but positive Phalen's test on both sides at 25 seconds.[6] (Id.) X-rays of both wrists were normal. (Id.) He opined that she had "[s]ubjective and objective signs of carpal tunnel syndrome with normal nerve conduction studies" and a history of tenosynovitis[7] in her fingers. (Id.) The latter could contribute to the former. (Id.) He recommended that she take an anti-inflammatory, have injections, first in the right wrist and later in the left, and wear the wrist splints at work and at home. (Id.) He gave her the injection in her right wrist. (Id.) She returned to Dr. Barnes two weeks later, reporting that the injection had helped only for several hours and she was then in intermittent, excruciating pain. (Id. at 390.) He explained

_____

[5]A Tinel's test, often positive in a person with carpal tunnel syndrome, is "performed by lightly banging (percussing) over the nerve to elicit a sensation of tingling or 'pins and needles' in the distribution of the nerve." MedicineNet.com, Definition of Sign, Tinel's, http://www.medterms.com/script/main/art.asp?articlekey+16688 (last visited March 13, 2007).

[6]Phalen's test is "[a] test for carpal tunnel syndrome in which both hands are held tightly palmarflexed opposite to a prayer position, creating at least a $90°$ angle between the forearm and the hand. If the test is positive, numbness and tingling are produced when the hands are held in this position for approximately 30 seconds." http://courses.washington.edu/hubio553/glossary/phalen.html (last visited March 13, 2007).

[7]Tenosynovitis is "[i]nflammation of a tendon and its enveloping sheath." Stedman's Medical Dictionary, 1770 (26th ed. 1995) (alteration added).

to her she had several options: first, to continue observation; second, to try an injection in her left wrist; and third, to have carpal tunnel release surgery. (Id.) If she wanted to pursue the latter, he preferred that she first see his associate, Dr. Winters. (Id.)

Plaintiff was evaluated by Dr. Winters, an orthopedist, on July 11. (Id. at 329-30.) He noted that her complaints of bilateral hand numbness, tingling, and pain had continued although she had been taken off the line at work. (Id. at 329.) Her medical history was significant for GERD. (Id.) On examination, she had a positive Phalen's and Tinel's percussion test, both indicative of carpal tunnel syndrome. (Id.) Consequently, Plaintiff was to undergo right endoscopic carpal tunnel release and trigger release through a separate incision of the right ring and middle fingers.[8] (Id.)

On July 29, Plaintiff was sent home from work early with stomach pain. (Id. at 272-73.) Dr. Maher diagnosed gastroenteritis. (Id. at 273.)

On August 8, Plaintiff consulted an orthopedist, Dr. Ritter, about her bilateral hand pain and burning at the request of her employer. (Id. at 350-51.) She reported that the pain began that February, a month after she moved from a night shift at work to a day shift. (Id. at 350.) Her only medication was Prilosec. (Id.) On examination, she had a negative Phalen's test; a Tinel's test was negative at the cubital tunnel, carpal tunnel, and ulnar tunnel. (Id. at 351.) These results and the results of other tests led Dr. Ritter to conclude that she was "probably having a mainly overuse syndrome." (Id.) "There [was] no suggestion of

---

[8]This surgery was originally to be performed on July 29, 2002. After the worker's compensation claim was denied, the surgery was delayed to January 2003.

carpal tunnel, ulnar nerve or cervical level disorder." (Id.) He concluded she should be restricted to the amount of weight she could lift, to no tight gripping, and to no repetitive lifting. (Id.)

Plaintiff was sent home again on August 28 when the nurse at Tyson's thought she had "pink eye." (Id. at 270-71.) The next day, she saw Dr. Ritter and told him she had been taken off the line and was working in front of the freezer door. (Id. at 352.) The cold was causing her further pain. (Id.) After an examination, Dr. Ritter again concluded that her bilateral hand pain and burning were attributable to overuse syndrome and not to carpal tunnel syndrome. (Id.) He prescribed an organized hand therapy program and wrist splints to be worn at work. (Id.) She was not to be exposed to cold. (Id.) Plaintiff returned to Dr. Ritter on September 19. (Id. at 352-53.) She had been moved from working by the freezer door to working by the "scald tank in the kill room at about 120-150° temperature." (Id. at 352.) She had "persistent dorsal right wrist pain and glove like distribution of tingling in the right hand." (Id.) She had swelling when she was active. (Id. at 353.) She had similar, but significantly less bothersome, symptoms in her left hand. (Id.) She had diminished grip strength, worse on the right, but no muscle atrophy or limitation in her range of motion in her hands, wrists, or forearms. (Id.) Dr. Ritter requested, and was granted, authorization to have Plaintiff undergo a bilateral EMG/NCV. (Id.) After these tests were performed, Dr. Ritter noted that they were "entirely" without abnormality. (Id. at 354.)

Plaintiff participated in a hand therapy program, as recommended by Dr. Ritter, from September 3 to October 18.  (Id. at 356-78.)  The reports of the nine visits listed an injury date of February 10, 2002.  (Id.)

After consulting another doctor about a bladder infection, Plaintiff complained to Dr. Maher on September 27 of persistent back pain.  (Id. at 268-69.)  She denied any injury or increased use.  (Id. at 268.)  She was prescribed Bextra, an anti-inflammatory, and given back exercises.  (Id. at 269.)

Plaintiff complained to Dr. Ritter in November about bilateral shoulder, elbow, wrist, and hand pain and stiffness and of numbness and pain in her right arm.  (Id. at 354.)  She had no limitation in her range of motion and no atrophy.  (Id.)  The only objective sign of any abnormality was her diminished symmetric grip strength.  (Id.)  He noted that when testing Plaintiff gave no effort until coached.  (Id.)  He assessed her condition as: "Bilateral hand and arm pain.  At the present time she has evidence of fairly nonphysiologic pattern of complaints that are rapidly expanding [without] evidence of initiating event or objective abnormality."  (Id.)  He kept her on her previous restrictions and scheduled her for a functional capacity evaluation ("FCE").  (Id.)  He considered her to be at maximum medical improvement.  (Id.)

Plaintiff underwent the FCE on November 14.  (Id. at 382-87.)  Plaintiff reported that she needed assistance in dressing, cooking, cleaning, and laundry.  (Id. at 384.)  The pain in her hands disturbed her sleep and usually kept her from going to sleep.  (Id.)  She did not do a home exercise program.  (Id.)  She was constantly dropping things.  (Id.)  After having the

pain scale explained to her, with zero being no pain and ten being pain that requires emergency room attention, Plaintiff was asked to rate the pain in her hands. (Id.) She rated the aching pain in her right had as a constant ten and in her left hand as a three at best and ten at worst. (Id.) Her current pain was a ten. She was asked if she needed to go the emergency room; she did not. (Id.) The pain scale was again explained. (Id.) She stated she understood, but continued to rate the current pain in her right hand as a ten. (Id.) After reporting that she was going deer hunting that weekend and being asked how she was going to shoot or hold up the gun, she explained that if she had to she would prop her gun up and pull the trigger. (Id.) Her lifting, exertional, and motion limitations were assessed. (Id. at 383, 385-87.) The clinician concluded that Plaintiff was exhibiting an inconsistent performance and self-limiting behavior. (Id. at 382, 383.) She did have, however, the functional capacity to perform light work. (Id. at 382.) Dr. Ritter explained to her that she was "medical [sic] safe" with light duty activities. (Id. at 355.)

In January 2003, Plaintiff was evaluated by Dr. Coin at the request of Tyson's. (Id. at 247-52.) She complained of pain and numbness in her hands for at least the past year; shooting pains up to her elbows; and aching in her upper extremities radiating to her shoulders. (Id. at 249.) The only medication she reported taking daily was ibuprofen. (Id.) She had no history of diabetes, rheumatoid arthritis, or thyroid disorders. (Id.) On examination, she was not in any obvious distress. (Id.) There was no evidence of any overt edema, erythema, deformity, or muscle wasting in her upper extremities. (Id.) She had good mobility and strength in her neck and shoulders, but also had pain to palpation throughout

her upper arms and into the shoulder regions, with the pain being worse on the right. (Id.) She also had good mobility in her elbows, wrists, and fingers. (Id.) There was a negative Tinel's sign at the cubital tunnels and carpal tunnels. (Id.) She had a bilateral equivocal Phalen's and Finkelstein's[9] tests. (Id.) X-rays of her elbows and wrists revealed low-grade degenerative arthritic changes in the first metacarpocarpal joints. (Id. at 250.) Dr. Coin diagnosed Plaintiff with tenosynovitis. (Id.) He opined that she needed further testing, physical therapy, and anti-inflammatory medication. (Id.) He also opined that she could return to work. (Id.) A bone scan was then scheduled and later cancelled after Plaintiff informed Dr. Coin that she had proceeded with carpal tunnel release surgery. (Id.)

On January 29, Plaintiff underwent that surgery on her right wrist and the release of her right ring and middle finger. (Id. at 328, 343-47.) Her wounds "healed nicely," but she still had some limited mobility in the fingers and wrist at a follow-up visit in February. (Id. at 327.) She was to participate in therapy twice a week for three weeks to mobilize and strengthen her hand. (Id.) At the following month's visit, her grip strength had increased by seven pounds. (Id.) She decided to undergo left endoscopic carpal tunnel release, and did so on March 12. (Id. at 327, 338-42.) Following that surgery, she had good mobility in her fingers and wrist, but continued to have limited mobility in her right fingers. (Id.) Notes of

---

[9]A Finkelstein test is used to diagnose de Quervain's tenosynovitis. MayoClinic.com, De Quervain's tenosynovitis, http://mayoclinic.com/health/de-quervains-tenosynovitis/DS00692/DSECTION=6 (last visited March 13, 2007). To perform the test, the thumb is bent across the palm of the hand, the fingers are bent down over the thumb, and the wrist is bent toward the little finger. Id. If the test causes pain on the thumb side of the wrist, it is considered positive. Id.

her physical therapy sessions between March 24 and May 8 indicate consistent complaints by Plaintiff of pain, swelling, and weakness.  (<u>Id.</u> at 334-37.)

Also in March, Plaintiff returned to Dr. Maher for a refill of her Prilosec prescription.  (<u>Id.</u> at 267.)   The Prilosec was renewed, and she was also prescribed Wellbutrin, an antidepressant.  (<u>Id.</u>)  The diagnosis was GERD, tobacco use, and a weight gain related to cold intolerance.  (<u>Id.</u>)  In April, Dr. Winters noted that Plaintiff was making good progress in therapy with grip strength of 30 pounds on the right and 34 on the left.  (<u>Id.</u> at 326.)  She had good mobility in the wrists and was regaining mobility in her right fingers.  (<u>Id.</u>)  She was released to return to work on May 9.  (<u>Id.</u>)  On May 22, her grip strength had continued to increase.  (<u>Id.</u> at 324.)  She had returned to work.  (<u>Id.</u>)  Dr. Winters anticipated one final follow-up visit the next month, at which time he would discharge her.  (<u>Id.</u>)  He gave her a prescription for Vicodin and told her to begin to wean herself off the medication.  (<u>Id.</u>)

At that final visit, Plaintiff informed Dr. Winters that her discomfort had increased when she was at work and she had continued her leave her absence.  (<u>Id.</u> at 323.)  She had obtained an attorney to represent her in her worker's compensation claim.  (<u>Id.</u>)  Dr. Winters assessed her as having a permanent and partial disability rating of 5% of the person as a whole.  (<u>Id.</u>)  He opined that she had obtained maximal medical improvement, and discharged her.  (<u>Id.</u>)

Plaintiff also saw Dr. Maher in June, complaining of vomiting due to an increase in pain in her hands.  (<u>Id.</u> at 263.)  She had a prescription for Vicodin but could not use it at work.  (<u>Id.</u> at 263.)  Her blood pressure was higher.  (<u>Id.</u>)  Her smoking had increased; she

was encouraged to stop.  (Id.)  She was prescribed Vioxx and given wrist splints to wear at home.  (Id.)  Although she was not in acute distress, she appeared anxious and angry.  (Id.)  She was to follow up with an orthopedist.  (Id.)

Plaintiff was evaluated in September by Dr. Eaton at the request of her worker's compensation attorney.  (Id. at 232-41.)  After summarizing her medical, educational, work, and social history and detailing her work duties at Tyson's that gave rise to her hand and arm complaints, Dr. Eaton examined Plaintiff.  (Id. at 232-36.)  He found, inter alia, a full active range of motion in her shoulders; motor strength of 5/5 throughout her bilateral upper extremities to the level of the wrist; no signs of active disease and a full range of motion with good strength in her lower extremities; no sign of elbow instability or deficiency of elbow flexion or extension; a positive Tinel's at the elbows and the right wrist; limited flexion at the wrists; and a bilateral positive Finkelstein's test.  (Id. at 236.)  He then formulated the following work restrictions:

> Wrist splints 23-hours a day, gel padding at palms and hands for any activities involving motorized activity or vibration.  No prolonged use of a keyboard, use of a headset for all telephone activities.  No repetitive activity reaching below waste level, no activity reaching above mid chest level.  Sit-stand option, padded flooring, arm supports, gel padded wrist rests with a 15 minute break every 45 minutes of use of the upper extremities.  No repetitive activity greater than three times per minute for a period not to exceed 45 minutes at any given time and not to exceed four 45-minute periods in any 24 hour period.  These activities are not to occur on more than five consecutive days.  No night or evening shift work so that sleep can be normalized.  No manipulation of fine parts smaller than ½ inch in diameter.  No lifting greater than 5 lbs. combined upper extremities, no lifting greater than 2 lbs. with the right upper extremity.  Use of padded elbow extension braces to protect the ulnar nerve on the left elbow and the right elbow 23-hours per day.  These are permanent restrictions.

(Id. at 238.)  The next week, Dr. Eaton performed nerve conduction studies on Plaintiff.  (Id. at 231.)  These studies revealed problems with the ulnar nerve bilaterally.  (Id.)  He recommended that she wear elbow pads to accompany her right wrist splint.  (Id.)  He was unsure if the problems were intermittent or just not previously detectable.  (Id.)

On December 18, Plaintiff informed Dr. Davis that she had been diagnosed with cubital tunnel syndrome.  (Id. at 256.)  She had had a cough and nasal discharge for several months.  (Id.)  A computed tomography ("CT") scan of her nasal sinuses revealed "[p]robable mild right maxillary sinusitis."  (Id. at 259.)  Antibiotics were prescribed.  (Id. at 256.)  Eight days later, she consulted Dr. Davis about right wrist pain following a fall on her right arm.  (Id. at 255.)  An x-ray of the wrist was normal.  (Id. at 258.)

On January 2, 2004, she told a nurse practitioner in Dr. Davis' office that she was not feeling any better on the antibiotics.  (Id. at 254.)  A different medication was prescribed. (Id.)

In March, Plaintiff consulted Dr. Davis about right-elbow pain of several months' duration.  (Id. at 229.)  She had a decreased range of motion in the elbow in a lateral extension.  (Id.)  An x-ray showed no fracture, dislocation, or significant degenerative change.  (Id. at 210.)

A magnetic resonance imaging ("MRI") scan of her left knee in August after her knee "gave way" revealed joint effusion and degenerative intersubstance-type changes in her medial and lateral meniscus.  (Id. at 206, 220.)  An x-ray showed no evidence of a fracture or dislocation.  (Id. at 207.)  An MRI of her right knee showed prominent joint effusion and

mild chrondomalacia patellae, but no evidence of a meniscal or cruciate ligament tear. (<u>Id.</u> at 208.) It was noted that Plaintiff had had a recent four-wheeler accident and had injured her right foot and leg. (<u>Id.</u>) An x-ray of her right knee showed no acute process. (<u>Id.</u> at 209.)

On September 13, Plaintiff had an injection in her left knee to relieve pain. (<u>Id.</u> at 219.) Five days later, she had an injection to her right knee to relieve pain. (<u>Id.</u> at 218.)

On November 10, Plaintiff consulted Dr. Davis about a cold and to refill her prescriptions. (<u>Id.</u> at 216.) It was noted that she was wearing wrist splints. (<u>Id.</u>) She was to return in three months. (<u>Id.</u>)

An MRI of her left knee was taken again in December when Plaintiff reinjured that knee by falling when taking care of animals. (<u>Id.</u> at 204, 212.) This MRI again revealed joint effusion and degenerative changes in her medial and lateral meniscus. (<u>Id.</u> at 204.) It also revealed fluid adjacent to the iliotibial band and edema involving the soft tissues. (<u>Id.</u>) A chest x-ray showed no evidence of an acute cardiopulmonary process. (<u>Id.</u> at 205.) She was to follow up with an orthopedist for her knee pain. (<u>Id.</u> at 211.)

That same month, Plaintiff reported coughing and feeling back pain for the past two or three days. (<u>Id.</u> at 215.) She was diagnosed with bronchitis, GERD, and chronic pain. (<u>Id.</u>) Two days later, Dr. Davis noted that Plaintiff's back pain was not any better. (<u>Id.</u> at 213.) She was prescribed Skelaxin. (<u>Id.</u>)

On January 28, 2005, Sonny Bal, M.D., a physician at the University of Missouri Orthopaedic Clinic, performed a patellofemoral chondroplasty, a medial  femoral

chondroplasty, and a lateral patellar release on Plaintiff's left knee. (Id. at 200-01.) The post-operative diagnosis was degenerative joint disease of the patellofemoral joint, lateral patella tilt, and advanced chondromalacia at the patellar release. (Id. at 200.)

The ALJ also had before him the report of a non-examining, consulting physician.

Jean Diemer, M.D., completed a Physical Residual Functional Capacity Assessment of Plaintiff in April 2004. (Id. at 161-69.) She listed Plaintiff's primary diagnosis as carpal tunnel syndrome; a trigger finger as the secondary diagnosis; and high blood pressure as another alleged impairment. (Id. at 161.) Dr. Diemer opined that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, and sit, stand, or walk about 6 hours in an 8-hour workday. (Id. at 162.) She had no postural, visual, communicative, or environmental limitations. (Id. at 164-66.) Her only manipulative limitation was gross manipulation. (Id. at 165.)

## The ALJ's Decision

The ALJ first noted that Plaintiff had not engaged in substantial gainful activity after June 5, 2003. (Id. at 17.) He next found that she had severe impairments of bilateral carpal tunnel syndrome, status-post release surgeries, tenosynovitis of two fingers of her right hand, and right elbow strain. (Id. at 18.) Her status-post knee surgery related to a recent knee injury incurred when hunting with her boyfriend and did not satisfy the 12-month durational requirement. (Id.) The ALJ then addressed the question whether Plaintiff could return to her past relevant work. (Id.)

- 23 -

To answer this question, the ALJ summarized the medical evidence. (Id. at 18-22.)
He also evaluated Plaintiff's credibility, finding that portions of the record detracted from
that credibility, including (a) the finding of Dr. Winters that she had only a 5% permanent
partial disability of the person as a whole; (b) her statement that she was going deer hunting
at the same time that she complained of right hand pain at a level of ten; (c) her statement
that her pain was a ten at the same time she declined to go to the emergency room; (d) her
self-limiting, inconsistent behavior on the FCE; (e) her noncompliance with Dr. Coin's
suggesting she obtain a recent EMG/NCV and with her doctors' instructions to stop smoking;
(f) her activities, including deer hunting; (g) her failure to seek psychiatric treatment
although she complained of depression and to take strong pain-relief medication; (h) her
failure to seek regular and sustained medical treatment for her carpal tunnel syndrome and
her knee strain; and (i) her low earnings, earnings which were less in 13 of the 15 years in
which she had earned income than the amount of income she would have on SSI. (Id. at 19-
24.)

Also in assessing Plaintiff's RFC, the ALJ specifically addressed and discounted Dr.
Eaton's description of that RFC, finding it inconsistent with his own examination results and
with the record as a whole, including the interpretation of Plaintiff's EMG/NCV's by Drs.
Barnes and Tellow.

Giving Plaintiff the "benefit of great doubt," the ALJ determined that she had the RFC
to frequently lift ten pounds, occasionally lift twenty pounds, and to stand and walk for six
hours in an eight-hour day. (Id. at 24.) She did need to avoid cold temperatures. (Id.) This

RFC prevented Plaintiff from returning to her past relevant work.  (Id. at 24.)  Applying the Medical-Vocational Guidelines (the "Grid") and considering Plaintiff's age, education, vocationally relevant work experience, the ALJ concluded that her RFC did not prevent her from performing the full range of light or sedentary work.  (Id. at 24-25.)

She was not, therefore, disabled within the meaning of the Act.  (Id. at 25.)

## Additional Records Before the Appeals Council

As noted above, the Appeals Council considered additional medical records.  These records begin with Plaintiff's visit to Dr. Bal the month after he had performed the release procedure on her left knee in January 2005.  In February, she reported feeling a little better.  (Id. at 410.)  She was to wear a brace, exercise, and take pain pills.  (Id.)  A decision about her right knee was postponed until the next month, when Dr. Bal could see how well she recovered from the left knee procedure.  (Id.)  In March, Plaintiff informed Dr. Bal that she was happy with the good, but not perfect, result of the procedure.  (Id. at 408-09.)  She complained of pain the right knee.  (Id. at 408.)  Dr. Bal suspected that she had degenerative joint disease in this knee as well.  (Id.)  Plaintiff wished to proceed with arthroscopy with lateral release on the right knee.  (Id.)  X-rays taken the same day as her visit to Dr. Bal indicated some narrowing of the medial compartment joint space in Plaintiff's right knee.  (Id. at 413.)

A lateral release was performed on her right knee on March 25.  (Id. at 406.)  Two months later, Plaintiff reported continuing bilateral knee pain, greater in the right than the left.  (Id.)  She said she had been wearing her brace.  (Id.)  "Examination of the knee

reveal[ed] that she [did] have palpable crepitus and subluxation bilaterally at the patella laterally with flexion and extension." (Id.) X-rays of her right knee showed mild degenerative changes. (Id. at 412.) Dr. Bal spoke with Plaintiff about being compliant with wearing the brace and gave her a Synvisc injection. (Id. at 407.) He opined that she would likely need another lateral release, perhaps a bilateral release. (Id.) Plaintiff was given another injection in May. (Id. at 404.) The nurse practitioner was not "quite sure" if she had been wearing the brace. (Id.)

## **Legal Standards**

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B) (alterations added).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520. See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second,

the claimant must have a severe impairment.  See 20 C.F.R. § 404.1520(c).  The Social

Security Act defines "severe impairment" as "any impairment or combination of impairments

which significantly limits [claimant's] physical or mental ability to do basic work

activities . . ." Id. (alteration added).  "The sequential evaluation process may be terminated

at step two only when the claimant's impairment or combination of impairments would have

no more than a minimal impact on her ability to work."  **Caviness v. Massanari**, 250 F.3d

603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether

the claimant has a severe impairment which meets or equals one of the impairments listed

in the regulations and whether such impairment meets the twelve-month durational

requirement.  See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1.  If the

claimant meets these requirements, she is presumed to be disabled and is entitled to benefits.

**Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step in the process, the ALJ "review[s] [claimant's] residual functional

capacity and the physical and mental demands of the work [claimant has] done in the past."

20 C.F.R. §§ 404.1520(e) and 416.920(e) (alterations added).  "[RFC] is what the claimant

is able to do despite limitations caused by all the claimant's impairments."  **Lowe v. Apfel**,

226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added).

"[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the

ability to perform the requisite physical acts day in and day out, in the sometimes

competitive and stressful conditions in which real people work in the real world.'"  **Ingram**

**v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added).  Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence.  **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added).  Some medical evidence must be included in the record to support an ALJ's RFC holding.  **Id.** at 867.  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'"  **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility.  **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217.  This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions."  **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)).  Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary."  **Id.**  See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical

evidence regarding a claimant's disability is inconsistent.").  After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

The burden at step four remains with the claimant.  <u>See</u> **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824.  <u>See also</u> 20 C.F.R. § 404.1520(f).  The Commissioner may meet his burden by referring to the medical-vocational guidelines (the "Grid") or by eliciting testimony by a vocational expert. **Pearsall**, 274 F.3d at 1219.  The Grid may not be relied on if the claimant suffers from non-exertional impairments unless those impairments "do not diminish or significantly limit the claimant's [RFC] to perform the full range of Guideline-listed activities[.]" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (alterations added; interim quotations omitted).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a

whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937.  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision."  **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision.  **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998).  The court may not reverse that decision merely substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently." **Strongson**, 361 F.3d at 1070.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision."  **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

## Discussion

Citing her testimony and Dr. Eaton's report, Plaintiff argues that the ALJ's decision (a) erroneously required that Plaintiff's pain be supported by objective evidence; (b) failed to give her subjective complaints the appropriate weight and improperly characterized her testimony; (c) failed to assess the combined effect of the impairments she suffers; and (d) improperly assumed that she no longer had any problems associated with carpal tunnel syndrome because she had had surgery. The Commissioner disagrees.

The success of any of Plaintiff's arguments depends on the ALJ erroneously weighing Dr. Eaton's assessment of Plaintiff's RFC and evaluating her credibility. For the reasons set forth below, the ALJ did neither.

"'The [social security] regulations provide that a treating physician's opinion . . . will be granted 'controlling weight' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" **Holmstrom v. Massanari**, 270 F.3d 715, 720 (8th Cir. 2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000)) (alterations in original). Accord **Cox v. Barnhart**, 471 F.3d 902, 907 (8th Cir. 2006); **Goff v. Barnhart**, 421 F.3d 785, 790 (8th Cir. 2005); **Reed v. Barnhart**, 399 F.3d 917, 920 (8th Cir. 2005). See also **Hacker v. Barnhart**, 459 F.3d 934, 937 (8th Cir. 2006) ("A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it."). The longer a claimant's physician has treated her and the more times, the more weight is given to that physician's opinion. 20 C.F.R. § 404.1527(d)(2)(i). And, the more knowledge a

physician has about the claimant's impairments, the more weight is given to that physician's medical opinion. 20 C.F.R. § 404.1527(d)(2)(ii). "[T]he more consistent an opinion is with the record as a whole, the more weight . . . will [be] give[n] that opinion." 20 C.F.R. § 404.1527(d)(4) (alterations added). Conversely, "[a] treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions." **Hacker**, 459 F.3d at 937 (alteration added). See also **Guilliams v. Barnhart**, 393 F.3d 798, 803 (8th Cir. 2005) ("Physician opinions that are internally inconsistent, however, are entitled to less deference than they would receive in the absence of inconsistencies.").

Dr. Eaton saw Plaintiff twice at the request of her worker's compensation attorney. The first time was to evaluate her RFC. After noting, inter alia, that she had full muscle strength in her arms to the level of her wrists, no sign of elbow instability or deficiency of movement, and no signs of active disease and a full range of motion with good strength in her lower extremities, he described her as requiring padded elbow extension braces, a sit and stand option, and a need for a break every 45 minutes of use of upper extremities. At his next, and last visit, he performed a nerve conduction study and found problems with her ulnar nerve bilaterally. Previous EMG/NCV's, including one conducted by a neurologist, had shown no ulnar nerve problem. The ALJ did not err in his assessment of Dr. Eaton's inconsistent report. See **Jenkins v. Apfel**, 196 F.3d 922, 925 (8th Cir. 1999) (holding that the opinion of a physician who examines a claimant once or not at all does not "generally constitute substantial evidence") (interim quotations omitted).

The ALJ also did not err in his assessment of Plaintiff's credibility.

The ALJ did not, as claimed by Plaintiff, require objective evidence of her pain. Rather, he noted the lack of any objective medical evidence to support Plaintiff's complaints as one consideration when evaluating her credibility. This is a proper consideration. See **Raney v. Barnhart**, 396 F.3d 1007, 1011 (8th Cir. 2005); **Stephens v. Shalala**, 50 F.3d 538, 541 (8th Cir. 1995). Other factors properly considered by the ALJ were the lack of any strong pain medication, see **Masterson v. Barnhart**, 363 F.3d 731, 739 (8th Cir. 2004); **Haynes v. Shalala**, 26 F.3d 812, 814 (8th Cir. 1994), her failure to seek sustained medical treatment, see **Ostronski v. Chater**, 94 F.3d 413, 418 (8th Cir. 1996), and her failure to stop smoking in order to alleviate the pain caused by her carpal tunnel syndrome, see **Choate v. Barnhart**, 457 F.3d 865, 872 (8th Cir. 2006) (holding that an ALJ may properly consider a claimant's noncompliance with a treating physician's directions, including to stop smoking and to seek treatment). Also relevant, but not dispositive, was the consideration that Plaintiff's prospective disability benefits would surpass her earnings in all but two of the years in which she was employed. See **Ramirez**, 292 F.3d at 581. See also **Frederickson v. Barnhart**, 359 F.3d 972, 976 (8th Cir. 2004) (a claimant's poor work history is relevant when assessing her credibility; **Hutton v. Apfel**, 175 F.3d 651, 655 (8th Cir. 1999) (same); **Siemers v. Shalala**, 47 F.3d 299, 301 (8th Cir. 1995) (same). Nor did the ALJ err when considering Plaintiff's daily activities as detracting from her credibility. The records indicate that she went turkey and deer hunting, watched two hours of television, and did household chores. Although Plaintiff later testified that she attempted to do some of these things, other

records, e.g., including her answers on a questionnaire, indicated that she did do these activities. See **Hutton**, 175 F.3d at 655 (daily activities of making breakfast, washing dishes, doing laundry, watching television, visiting with friends, and driving car and lack of physical restrictions were inconsistent with claims of disability).

### Conclusion

The question is not how this Court would decide whether Plaintiff is disabled within the meaning of the Act, but is whether the ALJ's decision that she is not is supported by substantial evidence in the record as a whole, including a consideration of the evidence that detracts from the ALJ's decision. For the reasons discussed above, there is such evidence. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this   14th   day of March, 2007.